STERN ELECTRONICS, INC.,
Plaintiff-Appellee,

v.

Harold KAUFMAN d/b/a Bay Coin,
et al., Defendants,

and

Omni Video Games, Inc., et al.,
Defendants-Appellants.

No. 1674, Docket 81–7411.

United States Court of Appeals,
Second Circuit.

Argued July 15, 1981.

Decided Jan. 20, 1982.

---

Robert Wieck, Providence, R.I. (Adler, Pollock & Sheehan, Inc., Providence, R.I., and Schulte, Roth & Zabel, New York City, on the brief), for defendants-appellants.

George H. Gerstman, Chicago, Ill. (Pigott, Gerstman & Ellis, Ltd., Chicago, Ill., Steven B. Pokotilow, Randy Lipsitz, and Blum, Kaplan, Friedman, Silberman & Beran, New York City, on the brief), for plaintiff-appellee.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and DUMBAULD,* District Judge.

**NEWMAN, Circuit Judge:**

This appeal from the grant of a preliminary injunction concerns primarily the availability of copyright protection for the visual images electronically displayed by a coin-operated video game of the sort currently enjoying widespread popularity throughout the country. Omni Video Games, Inc., its distributor, and two of its officers appeal from an order entered May 22, 1981 in the District Court for the Eastern District of New York (Eugene H. Nickerson, Judge), preliminarily enjoining them from infringing the copyright of Stern Electronics, Inc. in the audiovisual work entitled "Scramble" and from making further use of the trademark "SCRAMBLE" in connection with electronic video games. 523 F.Supp. 635. Appellants contend that the visual images and accompanying sounds of the video game fail to satisfy the fixation and originality requirements of the Copyright Act, 17 U.S.C.App. § 102(a) (1976), and that they, rather than appellees, have superior rights to the mark "SCRAMBLE". We reject these contentions and affirm the preliminary injunction.

Video games like "Scramble" can roughly be described as computers programmed to create on a television screen cartoons in which some of the action is controlled by the player. In Stern's "Scramble," for example, the video screen displays a spaceship moving horizontally through six different scenes in which obstacles are encountered. With each scene the player faces increasing difficulty in traversing the course and scoring points. The first scene depicts mountainous terrain, missile bases, and fuel depots. The player controls the altitude and speed of the spaceship, decides when to release the ship's supply of bombs, and fires lasers that can destroy attacking missiles and aircraft. He attempts to bomb the missile bases (scoring points for success), bomb the fuel depots (increasing his own diminishing fuel supply with each hit),

---

* The Honorable Edward Dumbauld of the United States District Court for the Western District of Pennsylvania, sitting by designation.

avoid the missiles being fired from the ground, and avoid crashing his ship into the mountains. And that is only scene one. In subsequent scenes the hazards include missile-firing enemy aircraft and tunnel-like airspaces. The scenes are in color, and the action is accompanied by battlefield sounds.

The game is built into a cabinet containing a cathode ray tube, a number of electronic circuit boards, a loudspeaker, and hand controls for the player. The electronic circuitry includes memory storage devices called PROMs, an acronym for "programmable read only memory."[1] The PROM stores the instructions and data from a computer program in such a way that when electric current passes through the circuitry, the interaction of the program stored in the PROM with the other components of the game produces the sights and sounds of the audiovisual display that the player sees and hears. The memory devices determine not only the appearance and movement of the images but also the variations in movement in response to the player's operation of the hand controls.

Stern manufactures amusement equipment, including video games, for distribution worldwide. In January 1981 at a London trade exhibit Stern became aware of "Scramble," an electronic video game developed in late 1980 by a Japanese corporation, Konami Industry Co., Ltd. The audiovisual display constituting what Stern alleges is the copyrightable work was first published in Japan on January 8, 1981. Stern secured an exclusive sub-license to distribute the "Scramble" game in North and South America from Konami's exclusive licensee, and began selling the game in the United States on March 17, 1981. Even in the fast-paced world of video games, "Scramble" quickly became a big success. Approximately 10,000 units were sold at about $2,000 each in the first two months for an initial sales volume of about $20 million.

On April 14, 1981, a Certificate of Copyright Registration for the audiovisual work "Scramble" was issued to Konami by the United States Copyright Office, and shortly thereafter documents were filed with the Copyright Office reflecting the license and sub-license to Stern. To satisfy the statutory requirement for deposit of copies of a work to be copyrighted, 17 U.S.C.App. § 408(b) (1976), Konami submitted video tape recordings of the "Scramble" game, both in its "attract mode" and in its "play mode."[2]

Omni alleges that, concurrently with Stern's sales of the "Scramble" game and even earlier, it was endeavoring to sell a line of video game products so constructed that each unit could be equipped for playing different games by substituting a PROM containing the program for a particular game. Omni contends that it planned to market this line of interchangeable games with the label "Scramble" affixed to the headboard of each unit; the name of the particular game was also to be prominently displayed. On December 1, 1980, Omni's president ordered ten silk screen name plates bearing the name "Scramble." Between that date and March 17, 1981, the date of Stern's first sale of its "Scramble" game, Omni sold five units of video games bearing the name "Scramble" on the headboard. In April 1981 Omni began to sell a video game called "Scramble" that not only bears the same name as the "Scramble" game Stern was then marketing, but also is

1. Memory devices of computers are generally either RAM (random access memory) or ROM (read only memory). RAM, used in most sophisticated computers, is a memory device in which stored information can be changed simply by writing in new information that replaces old information. The stored information in a ROM cannot be changed; it is imprinted into the ROM when the device is manufactured. A PROM is a ROM into which information can be imprinted (programmed) after manufacture; once the information is programmed in a PROM, it cannot be changed simply by writing in a new program. See A. Lippiatt, The Architecture of Small Computer Systems § 1.4.6, at 12–13 (1979).

2. "Attract mode" refers to the audiovisual display seen and heard by a prospective customer contemplating playing the game; the video screen displays some of the essential visual and sound characteristics of the game. "Play mode" refers to the audiovisual display seen and heard by a person playing the game.

virtually identical in both sight and sound. It sold this copy of Stern's "Scramble" game, known in the trade as a "knock-off," for several hundred dollars less than Stern's game.

### 1. Copyright Issues

In challenging the preliminary injunction that bars distribution of its "Scramble" game, Omni does not dispute that Konami and its sub-licensee Stern are entitled to secure some copyright protection for their "Scramble" game. Omni contends that Konami was entitled to copyright only the written computer program that determines the sights and sounds of the game's audiovisual display.[3] While that approach would have afforded some degree of protection, it would not have prevented a determined competitor from manufacturing a "knock-off" of "Scramble" that replicates precisely the sights and sounds of the game's audiovisual display. This could be done by writing a new computer program that would interact with the hardware components of a video game to produce on the screen the same images seen in "Scramble," accompanied by the same sounds. Such replication is possible because many different computer programs can produce the same "results," whether those results are an analysis of financial records or a sequence of images and sounds. A program is simply "a set of statements [i.e., data] or instructions to be used directly or indirectly in a computer in order to bring about a certain result," Pub. L.No. 96–517, § 10(a), 94 Stat. 3015, 3028 (1980) (amending 17 U.S.C.App. § 101 (1976)). To take an elementary example, the result of displaying a "4" can be achieved by an instruction to add 2 and 2, subtract 3 from 7, or in a variety of other ways. Obviously, writing a new program to replicate the play of "Scramble" requires a sophisticated effort, but it is a manageable task.

To secure protection against the risk of a "knock-off" of "Scramble" based upon an original program, Konami eschewed registration of its program as a literary work and chose instead to register the sights and sounds of "Scramble" as an audiovisual work. See 17 U.S.C.App. § 102(a)(6) (1976). The Act defines "audiovisual works" as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied." 17 U.S.C.App. § 101 (1976). Omni contends that Konami is not entitled to secure a copyright in the sights and sounds of its "Scramble" game because the audiovisual work is neither "fixed in any tangible medium of expression" nor "original" within the meaning of § 102(a). Both contentions arise from the fact that the sequence of some of the images appearing on the screen during each play of the game will vary depending upon the actions taken by the player. For example, if he fails to avoid enemy fire, his spaceship will be destroyed; if he fails to destroy enough fuel depots, his own fuel supply will run out, and his spaceship will crash; if he succeeds in destroying missile sites and enemy planes, those images will disappear from the screen; and the precise course travelled by his spaceship will depend upon his adjustment of the craft's altitude and velocity.

If the content of the audiovisual display were not affected by the participation of the player, there would be no doubt that the display itself, and not merely the written computer program, would be eligible for copyright. The display satisfies the statutory definition of an original "audiovisual work," and the memory devices of the game satisfy the statutory requirement of a "copy" in which the work is "fixed."[4] The

---

**3.** Written computer programs are copyrightable as literary works. See 1 M. Nimmer, *Nimmer on Copyright* § 2.04[C] (1981).

**4.** In arguing that the permanent "imprinting" of the computer program in the game's memory devices satisfies the requirement of fixation in a tangible medium, appellees direct our attention to the PROM, which contains, in elec-

Act defines "copies" as "material objects ... in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device" and specifies that a work is "fixed" when "its embodiment in a copy ... is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C.App. § 101 (1976). The audiovisual work is permanently embodied in a material object, the memory devices, from which it can be perceived with the aid of the other components of the game.

■ We agree with the District Court that the player's participation does not withdraw the audiovisual work from copyright eligibility. No doubt the entire sequence of all the sights and sounds of the game are different each time the game is played, depending upon the route and speed the player selects for his spaceship and the timing and accuracy of his release of his craft's bombs and lasers. Nevertheless, many aspects of the sights and the sequence of their appearance remain constant during each play of the game. These include the appearance (shape, color, and size) of the player's spaceship, the enemy craft, the ground missile bases and fuel depots, and the terrain over which (and beneath which) the player's ship flies, as well as the sequence in which the missile bases, fuel depots, and terrain appears. Also constant are the sounds heard whenever the player successfully destroys an enemy craft or installation or fails to avoid an enemy missile or laser. It is true, as appellants contend, that some of these sights and sounds will not be seen and heard during each play of the game in the event that the player's spaceship is destroyed before the entire course is traversed. But the images remain fixed, capable of being seen and heard each time a player succeeds in keeping his spaceship aloft long enough to permit the appearances of all the images and sounds of a complete play of the game. The repetitive sequence of a substantial portion of the sights and sounds of the game qualifies for copyright protection as an audiovisual work.

Appellants' claim that the work lacks originality proceeds along two lines. Repeating their attack on fixation, they assert that each play of the game is an original work because of the player's participation. The videotape of a particular play of the game, they assert, secured protection only for that one "original" display. However, the repeated appearance of the same sequence of numerous sights and sounds in each play of the game defeats this branch of the argument. Attacking from the opposite flank, appellants contend that the audiovisual display contains no originality because all of its reappearing features are determined by the previously created computer program. This argument is also without merit. The visual and aural features of the audiovisual display are plainly original variations sufficient to render the display copyrightable even though the underlying written program has an independent existence and is itself eligible for copyright. Nor is copyright defeated because the audiovisual work and the computer program are both embodied in the same components of the game. The same thing occurs when an audio tape embodies both a musical composition and a sound recording. Moreover, the argument overlooks the sequence of the creative process. Someone first conceived what the audiovisual display would look like and sound like. Originality occurred at that point. Then the program was written. Finally, the program was imprinted into the memory devices so that, in operation with the components of the game,

---

tronically usable form, the computer program for the game. While the PROM device contains the program specifically written for the "Scramble" game, there are undoubtedly some items of program stored in memory devices located in other components of the game.

Whether located in the PROM prepared for this particular game or elsewhere in the total assembly, all portions of the program, once stored in memory devices anywhere in the game, are fixed in a tangible medium within the meaning of the Act.

the sights and sounds could be seen and heard. The resulting display satisfies the requirement of an original work.

We need not decide at what point the repeating sequence of images would form too insubstantial a portion of an entire display to warrant a copyright, nor the somewhat related issue of whether a sequence of images (*e.g.*, a spaceship shooting down an attacking plane) might contain so little in the way of particularized form of expression as to be only an abstract idea portrayed in noncopyrightable form, *see Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). Assessing the entire effect of the game as it appears and sounds, we conclude that its repetitive sequence of images is copyrightable as an audiovisual display. *See Atari, Inc. v. Amusement World, Inc.*, No. 81–803 (D.Md. Nov. 27, 1981); *Midway Manufacturing Co. v. Drikschneider*, No. 81–0–243 (D.Neb. July 15, 1981); *Williams Electronics, Inc. v. Artic International, Inc.*, Civ. No. 81–1852 (D.N.J. June 24, 1981); *Cinematronics, Inc. v. K. Noma Enterprise Co.*, Civ. No. 81–439 (D.Ariz. May 22, 1981).

## 2. Trademark Issue

Appellants contend that they, rather than appellee, have superior common law rights in the mark "SCRAMBLE" based on their use of the mark in the United States in early 1981, prior to appellants' use. The District Court found that appellants' prior use was not bona fide and that appellee's use entitled it to injunctive relief against appellants' use. We agree.

Though there is no direct evidence that Omni learned of the "SCRAMBLE" mark because of the planned use of the mark by Konami and Stern, that inference was available to the District Court, at least for purposes of considering Stern's entitlement to a preliminary injunction. Omni appears to have attempted only a preemptive use of the mark by ordering just ten name plates with the mark and affixing just five of them to headboards of units of separately named games sold in early 1981. *Cf. La*

*Societe Anonyme Des Parfum LeGalion v. Jean Patou, Inc.*, 495 F.2d 1265 (2d Cir. 1974). The District Court was entitled to conclude that Omni was simply attaching a secondary label in a bad faith attempt to reserve a mark. *Blue Bell, Inc. v. Farah Manufacturing Co.*, 508 F.2d 1260 (5th Cir. 1975); *Blue Bell, Inc. v. Jaymar-Ruby, Inc.*, 497 F.2d 433 (2d Cir. 1974). Omni's claim that it sought to establish a trade name for its line of separately named, interchangeable games is undermined by the fact that once it secured a "knock-off" of Stern's "Scramble" game, it affixed only the mark "SCRAMBLE", thereby designating the name of the game, and not the line of which it was a part. As Judge Nickerson observed, "[I]t would be a truly remarkable coincidence if defendants independently thought of the name 'Scramble' and then, only a few months later, produced a video game virtually identical to the one bearing the same name. It is more likely that defendants sought to appropriate the trademark with the expectation that they would later imitate the audiovisual display."

Moreover, the equities abundantly justified issuance of an injunction against Omni's use of the mark. Stern has a substantial investment in the mark, having achieved success in the marketplace with its sales of a large number of units bearing the mark. By contrast, Omni has placed the mark on the headboard of five units of games that are not "Scramble" and has used the mark for a "Scramble" game that is a pirated "knock-off" of Stern's game.

The preliminary injunction is affirmed.