UNITED STATES of America,

v.

STEERWELL LEISURE CORP., INC., Burt Steir, Larry Shapiro, Peter Scattolini and Michael Sanders, Defendants.

UNITED STATES of America,

v.

Larry SHAPIRO, Defendant.

Nos. CIV–84–51C, CIV–84–52C.

United States District Court, W.D. New York.

Nov. 16, 1984.

Salvatore R. Martoche, U.S. Atty., Buffalo, N.Y. (Kathleen M. Mehltretter, Asst. U.S. Atty., Buffalo, N.Y., of counsel), for United States of America.

Cullen & Wall, Boston, Mass. (Albert F. Cullen, Jr., and Robert V. Carr, Boston, Mass., of counsel), and Boreanaz, Baker & Humann, Buffalo, N.Y. (Patrick J. Baker, Buffalo, N.Y., of counsel), for defendants.

CURTIN, Chief Judge.

This case concerns the alleged distribution of video games which, the government contends, infringe upon valid copyrights. Several motions are pending. The crimes charged in the indictment are conspiracy to violate 17 U.S.C. § 506(a) and 18 U.S.C. § 2319(b)(2)(B), relating to copyright infringement (Count I); substantive copyright infringement offenses (Counts II–IV); and interstate transportation of stolen goods (Counts VII–IX).

The defendants essentially claim that Counts I–VI of the indictment fail to properly allege violations of 17 U.S.C. § 506(a) and 18 U.S.C. § 2319(b)(2)(B).[1] Section 2319(b)(2)(B) provides for a maximum penalty of two years imprisonment and a $250,000.00 fine for violations of section 506(a) if the offense "involves the reproduction or distribution, during any one-hundred-and-eighty-day period, of more than seven but less than sixty-five copies infringing the copyright in one or more . . . audiovisual works."

Defendant Steir also argues that, prior to January 20, 1982, 17 U.S.C. § 506(a) did not

---

1. 17 U.S.C. § 506(a) provides as follows:
Any person who infringes a copyright willfully and for purposes of commercial advantage or private financial gain shall be punished as provided in section 2319 of title 18.

give adequate notice that video games could be the subject of a copyright infringement offense. This is the date of the Second Circuit's decision in *Stern Electronics v. Kaufman*, 669 F.2d 852 (2d Cir. 1982). Steir also attacks each count of the indictment because a "first sale" is not alleged.

Counts VII–IX allege violations of 18 U.S.C. § 2314, concerning interstate transportation of stolen items worth $5,000.00 or more. Defendants contend that infringing video games are not "goods, wares, merchandise," etc., which can be the subject of a prosecution under the statute.

The defendants have also filed a motion to suppress evidence seized pursuant to several search warrants issued by United States Magistrates.

Finally, defendant Shapiro has moved to dismiss the indictment due to certain expert testimony considered by the grand jury.

For the reasons stated below, these motions are denied.

### I.

With respect to Counts I–VI, the defendants contend that dismissal is required because the indictment fails to charge "distribution" of infringing items. In *Stern v. Kaufman, supra,* the Second Circuit held that video games are "audiovisual works" subject to copyright protection. The indictment specifically alleges that "the defendants did willfully and unlawfully ... distribute to the public" infringing video games (Indictment, CR–84–51, at p.4).

Reproduction and distribution of copyrighted works are among the exclusive rights of copyright owners. 17 U.S.C. § 106. The present indictment does not charge reproduction. It does allege distribution. The defendants attack this allegation by focusing upon other language in the indictment which charges the defendants with publicly performing and displaying the video games (Indictment, CR–84–51, at p.4).

The argument is that public performances and displays do not constitute distribution and that the business arrangements of the defendants did not amount to distribution. It is not necessary at this time to reach a legal conclusion upon the effect of the charges of performance and display. In *American Vitagraph, Inc. v. Levy,* 659 F.2d 1023, 1027 (9th Cir.1981), the court stated that mere performance does not amount to publication or distribution. However, the case does not stand for the proposition that performance and display are immaterial to the question of distribution.

More significantly, the court cannot, on a motion to dismiss, accept the defendants' way of characterizing the various transactions involved in this case. The indictment has charged distribution, and the government must now be given the opportunity to prove it. The motion to dismiss for failure to properly allege distribution is denied.

### II.

The motion to dismiss for lack of notice is also denied. The dates upon which the alleged violations took place all occurred before the date of the decision in *Stern v. Kaufman.* Before *Stern,* the question of whether video games qualified for copyright protection was not definitively settled.

However, it is not necessary that the law be absolutely settled. A defendant is on sufficient notice as long as the law is clear enough so that he is informed that the course of conduct he contemplates may fall perilously close to the line which separates what is legal from that which is not. Copyrightability of intangibles is hardly a novel idea. *United States v. Bottone,* 365 F.2d 389 (2d Cir.1966). The defendants in this case were on sufficient notice that the conduct alleged in the indictment was illegal. The motion to dismiss for lack of notice is denied.

### III.

The absence of an explicit allegation concerning a "first sale" is also not

grounds for dismissal of this indictment. The first sale doctrine is the principle that a copyright owner loses his exclusive right to sell a particular copy of his work after he parts with title to that particular copy. *United States v. Moore*, 604 F.2d 1228 (9th Cir.1979). However, this doctrine applies only to copies that are lawfully made. *United States v. Drum*, 733 F.2d 1503, 1507 (11th Cir.1984).

■ The present indictment contains allegations which, if true, preclude the possibility of a first sale. Specifically, the defendants are charged with distributing "unlawfully manufactured and unauthorized copies" of certain audiovisual works. The indictment is therefore sufficient.

### IV.

■ The defendants next attack the legal sufficiency of Counts VII–IX, which charge them with interstate transportation of stolen goods. *See*, 18 U.S.C. § 2314. Primary reliance is placed upon the Fifth Circuit's decision in *United States v. Smith*, 686 F.2d 234 (1982). *Smith* held that the words, "goods, wares [or] merchandise," as used in 18 U.S.C. § 2314, were not meant to describe such incorporeal privileges as copyrights. 686 F.2d at 241.

■ However, *Smith* is not the law in this circuit. Judge Friendly's opinion for the Second Circuit in *United States v. Bottone*, 365 F.2d 389, stated in no uncertain terms that intangible rights, embodied in tangible objects which are not themselves stolen, can be the basis of a prosecution under 18 U.S.C. § 2314. *Accord, United States v. Drum*, 733 F.2d 1503; *United States v. Gallant*, 570 F.Supp. 303 (S.D.N.Y.1983). The motion to dismiss Counts VII–IX is therefore denied.

### V.

Defendant Shapiro's motion to dismiss the indictment due to what he calls improper testimony by a grand jury witness is also denied. Shapiro argues that an expert witness's grand jury testimony, in which he stated his opinion that the video games at issue here infringed certain copyrights, usurped the function of the grand jury. This argument is not persuasive. The grand jury was free to accept or reject this testimony concerning infringement. The grand jury also could have rejected one expert's testimony on the ground of bias. (The witness was an employee of the manufacturer of the infringed games.) The defendants have failed to overcome the presumption that the grand jury proceedings were conducted according to law.

### VII.

Finally, the defendants have moved to suppress physical evidence seized pursuant to warrants signed by United States Magistrates in Buffalo, New York, and Newark, New Jersey. This motion is also denied.

As a preliminary matter, the court notes that the government's response to this motion relies primarily upon the recent decision of the Supreme Court in *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In that case, the Court modified the exclusionary rule, holding that it would not be applied to suppress evidence seized in good faith reliance upon a search warrant. However, this does not mean that trial courts ought to neglect making a determination of the probable cause issue. In a case such as this one, involving a difficult criminal statute, the government should have directed more of its energy toward the sufficiency of the affidavits upon which the warrants were based.

The affidavit of Special Agent John D. Culhane was the basis for 30 warrants authorizing searches of a Steerwell location in Cheektowaga, New York, and 29 businesses in the Buffalo area where allegedly infringing games leased by Steerwell were located. An affidavit by Special Agent John F. Campanella was the basis of the warrant authorizing the search of a Steerwell location in North Bergen, New Jersey.

The objects of both warrants were audiovisual works, computer programs, and business records relating to video games

which were substantially similar or identical to video games which are protected by valid copyrights. Particular attention was directed at games which were thought to infringe the following video games and their respective copyright holders:

| Video Game | Copyright Holder |
|---|---|
| GALAXIAN | Midway Manufacturing Co. |
| PAC–MAN | Midway Manufacturing Co. |
| RALLY–X | Midway Manufacturing Co. |
| DONKEY–KONG | Nintendo of America, Inc. |
| AMIDAR | Konami Industry Co., Ltd. |
| FROGGER | Gremlin Industries, Inc., a/k/a Sega Enterprises, Inc. |

*See* Culhane affidavit [hereafter "Culhane,"] p.4.

The Culhane and Campanella affidavits relied heavily upon investigators employed by the firms whose copyrights were allegedly infringed. For example, Robert Landry of the Midway Company went to the City Lights bar in Buffalo and examined what he thought to be an infringement of the PAC–MAN video game. The game at the City Lights had the words "PAC–MAN" on it and was enclosed in a white cabinet. Landry concluded it was an infringing game, because real PAC–MAN games are in yellow cabinets with red PAC–MAN figures. The electronic figures used in the game at City Lights were identical to real PAC–MAN figures (Culhane, pp. 11–12, ¶ 29).

Jon Pederson is Technical Services Manager for Nintendo, Inc., holder of the DON-KEY–KONG copyright. In January of 1983, he examined a game called "Congorilla" at Masullo's restaurant in Buffalo. He concluded that "the play of the game" was exactly like DONKEY–KONG, "except that the play sequences were out of order" (Culhane, p. 9, ¶ 25).

Approximately one month earlier, Agent Culhane had posed as a person opening a video arcade and spoke to Michael Sanders of Steerwell, Inc. Sanders told Culhane that one had to be careful of copyright violations and that one could get into trouble with "bad" games. Later, Culhane spoke with Peter Scattolini, a Steerwell manager. Scattolini told Culhane that "'CONGORILLA' was supposedly an infringement on a copyright and the Justice Department would normally investigate that type of violation." (Culhane, pp. 5–6, ¶¶ 12, 14, 17.) Culhane subsequently learned that in July, 1982, a federal court had issued a temporary restraining order preventing Steerwell from infringing upon DONKEY–KONG through the use of games called "Congorilla," "Crazy-Kong," and "Donkey-Kong" (Culhane, p. 5, ¶ 12).

Mr. Landry, Midway's expert, examined a game called "Galaxy" and concluded that it infringed upon Midway's copyright for GALAXIAN. The game had been purchased from Steerwell and had no copyright information on its electronic board. Landry said that "the play of the game is exactly the same as ... 'GALAXIAN.'" (Culhane, pp. 9–10, ¶ 26).

Landry reached a similar conclusion with respect to "Gobbler," a video game also purchased from Steerwell. He examined this game and noted that the figures were different from those on Midway's PAC–MAN but that "the play" of the two games was identical. Landry's opinion was that Gobbler was an infringing game (Culhane, p. 11, ¶ 28).

In the same way, Mr. Landry made a determination that a game called "Bull Frog" infringed upon Midway's copyright for FROGGER. Landry examined a "Bull Frog" game at a Buffalo restaurant and saw that its electronic board had no copyright information. He concluded that it was an infringing game (Culhane, p. 10, ¶ 27). Moreover, Agent Campanella described the play of "Bull Frog" during a telephone conversation with an attorney for FROGGER's copyright holder (Sega Enterprises). The attorney indicated that "Bull Frog" plays exactly as FROGGER does (Culhane, p. 10, ¶ 27).

A game called "Amigo" was described by Agent Campanella to Special Agent Warren Flagg. Agent Flagg had done extensive work investigating infringements upon a game called AMIDAR, whose copyright was held by Konami Industry Co., Ltd. Flagg's opinion was that "Amigo" infring-

ed the AMIDAR copyright (Culhane, p. 12, ¶ 30).

Agent Campanella examined an unnamed game at Millie and Dave's bar in Buffalo, New York. The game had no copyright information on it and had a play sequence similar to that of the RALLY–X game. Midway holds the copyright for RALLY–X. Campanella described the untitled game to a Midway investigator. Based upon Campanella's description and the absence of copyright information, the investigator concluded that the game was an infringement of the RALLY–X copyright (Culhane, pp. 12–13, ¶ 31).

During the course of their investigation, the agents learned that "circuit boards" which determine the play of a particular video game can be copied "relatively easily and at minimal expense." They also became aware that illegal games usually can be identified by the absence of a copyright notice or the presence of a false copyright notice, *logo*, or label. Illegal circuit boards can be identified in the same way (Culhane, pp. 3, ¶ 9; 34–35, ¶ 63).

■ The burden of proof in a criminal copyright case is particularly onerous. Works which are very similar to a protected work may still be found not to infringe that work. The nature of the offense is such that questions of probable cause must be addressed most carefully, because it is not illegal to possess works which come close to being infringements. It follows that it is, and should be, relatively difficult to establish the probability that criminal infringement has occurred. *United States v. Bily*, 406 F.Supp. 726 (E.D.Pa.1975).

■ The government's theory, as revealed by the affidavits, is that Steerwell leased video games to various businesses and that these games were substantially similar to games protected by copyrights. Substantial similarity is established "when an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966). This is shown when the

questioned work is so similar to the protected work that "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). Further, copyrights do not protect ideas, but only the expression of ideas. *Atari, Inc. v. North American Consumer Electronics Corp.*, 672 F.2d 607, 615 (7th Cir. 1982). In a criminal case, the elements of willfulness and the purpose of commercial gain are added. 17 U.S.C. § 506(a); 18 U.S.C. § 2319.

■ With these principles in mind, I find that there was probable cause to believe that the video games called "Congorilla," "Galaxy," "Gobbler," "Bull Frog," and "Amigo," were, respectively, infringements upon the copyrights for DONKEY–KONG, GALAXIAN, PAC–MAN, FROGGER, and AMIDAR. I also find that there was probable cause to believe that the untitled game at Millie and Dave's bar infringed the copyright for RALLY–X and that the "Pac-Man" game examined by Mr. Landry at the City Lights bar infringed the PAC–MAN copyright.

In the cases of "Congorilla," "Galaxy," "Bull Frog," the untitled game, and the "Pac-Man" game at the City Lights bar, persons employed by various copyright holders viewed the games (or had them described to them) and concluded that they were illegal games. The possible bias on the part of these persons may reduce their credibility as witnesses before a jury, but the magistrate was entitled to accept their conclusions, absent any indication of deliberate falsification. With respect to "Amigo," an agent experienced with investigating infringements of the AMIDAR copyright believed that AMIDAR was infringed.

■ However, a note of caution should be sounded. A magistrate's determination of probable cause would be facilitated if the agents' affidavits contained more details concerning the comparisons between protected games and infringing games. The details would not need to be technical.

The finding of substantial similarity is one that is based upon the view of a lay person. *See, Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d at 1022; *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d at 489. Accordingly, probable cause could be established by a lay person's description of the shape of a game's figures, the pattern of play, the sounds that accompany the play of the games, the scoring, and other factors.

The lack of such detail in the affidavits accompanying the warrants in this case does not prevent a finding of probable cause. The magistrates were informed that copying circuit boards is rather easy. Several games had no copyright information which is, as it were, a trademark of illegal games. Agent Culhane's conversations with Sanders and Scattolini at Steerwell's store in the Buffalo area gave further indication that the various games were illegal. Therefore, there was probable cause to search Steerwell's Buffalo area location for infringing games, circuit boards, and related business records.

There was also probable cause to search the 29 other Buffalo area locations. Agents observed "Congorilla" games at twelve of these places,[2] "Bull Frog" at four,[3] "Galaxy" at four,[4] "Gobbler" at six,[5] bogus "Pac-Man" games at four,[6] an untitled game similar to "Gobbler" at one,[7] untitled games similar to RALLY–X at two,[8] and a game called "Rally-Z" at one location.[9] Each location named in the warrants was a business at which agents had observed at least one video game which they had reason to believe was illegal.

The warrant for the search of Steerwell's location in North Bergen, New Jersey, was also supported by probable cause. This warrant was issued on January 22, 1983, two days after the execution of the warrant authorizing the search of Steerwell's Buffalo location. This warrant was based upon an affidavit by Agent Campanella.

The Campanella affidavit closely parallels the Culhane affidavit. However, it also contains statements taken from Scattolini and Sanders shortly after they were arrested during the search of Steerwell's Buffalo area location.[10] (Campanella affidavit, pp. 14–16.) Sanders and Scattolini admitted that Steerwell frequently handled illegal, or "brown bag," video games.

They also stated that these games were shipped from Buffalo to New Jersey every month. Sanders said that Steerwell's books at the Buffalo location were altered to conceal the fact that Steerwell dealt with illegal games. Finally, Scattolini said that Steerwell's headquarters were at the North Bergen location. Thus, there was ample probable cause to search this location for infringing games and related items.

2. *I.e.*, Art's Deli, Alma's Fun Shop, Barnaby's, City Lights, Gem Soul City, Keith's Deli, Lloyd's Lounge, The Maple Leaf, Masullo's, McCompton's, Miller's Pub, and the Pollex Deli (Culhane, pp. 17–30, ¶¶ 34–36; 40–43; 45–47; 49–51; 55).

3. At Alma's, Barnaby's, Cameron's, and Reid's Superette (Culhane pp. 17–20, 31, ¶¶ 34, 36, 39, 57).

4. At Club 1218, The Cracker Box Lounge, The Palladium, The Cavern (Culhane, pp. 22, 29, 33, ¶¶ 40, 53, 60).

5. At Alma's, Ciano's, Kar-Cyn's Straw Hat, Unnamed Bar, Squeezer Floyd's, and The Gate (Culhane, pp. 17, 21, 23, 32–33, ¶¶ 34, 39, 44, 58–59, 61).

6. At Alma's, Barnes' Door, City Lights, and the Malamute (Culhane, pp. 17, 19, 21, 26, ¶¶ 34, 37, 40, 48).

7. This game was seen at Pete's Pizzeria. Licensing records indicated that a PAC–MAN game was at this location, but no PAC–MAN game was observed there (Culhane, p. 30, §54(b).

8. At Millie and Dave's and at the Thruway Inn (Culhane, pp. 28, 34, ¶¶ 52, 62).

9. At Barnes' Door (Culhane, p. 20, ¶ 37).

10. Since the search of Steerwell's Buffalo area location was supported by probable cause, so too were the arrests of Sanders and Scattolini. Therefore, their statements were properly taken after they were advised of their rights. No deficiency in the *Miranda* warnings is alleged here.

The motions to suppress the evidence seized pursuant to the warrants are denied.

So ordered.