**MIDWAY MFG. CO., an Illinois corporation, Plaintiff,**

v.

**Roger STROHON a/k/a Frederick Slayton; Kathy Strohon; Clidata Services, Inc.; Gary Melnick; Update Kits, Inc.; and Midwest Amusements Manufacturers and Distributors, Defendants.**

No. 82 C 1305.

United States District Court, N.D. Illinois, E.D.

June 1, 1983.

Marcia Richards Bergen, Seiden & Shapiro, Chicago, Ill., for defendants.

Donald L. Welsh, A. Sidney Katz, Eric C. Cohen, Jerold B. Schnayer, Steven R. Smith, Fitch, Even, Tabin, Flannery & Welsh, Chicago, Ill., for plaintiff.

Richard H. Stern, Stern & Roberts, Washington, D.C., for amicus curiae, SHIELD Legal Action Committee, Ltd.

## MEMORANDUM OPINION

WILL, District Judge.

This matter is before us on plaintiff Midway Manufacturing Company's (Midway) motion to find defendants Roger Strohon a/k/a Frederick Slayton and others (hereinafter, collectively "Slayton") in civil contempt of our March 23, 1982 preliminary injunction against infringement of any of Midway's copyrights in its popular PAC–MAN game and against misuse of Midway's PAC–MAN trademarks. The plaintiff also seeks a modification of the March 23 preliminary injunction that would specifically restrain Slayton from selling a so-called CUTE–SEE modification kit for use in PAC–MAN game machines manufactured and marketed by Midway.

We held a hearing on the motion on December 15, 1982 at which both the copyrighted and accused works were demonstrated and have reviewed subsequent briefs from the parties and from the "SHIELD Video Game Industry Legal Justice Committee, Ltd." (Shield) as *amicus curiae*. We now conclude: (1) Slayton's CUTE–SEE modification kit does not infringe Midway's copyright in the audiovisual component of the PAC–MAN game; (2) Slayton's CUTE–SEE modification kit does, however, infringe Midway's distinct "literary works" copyright in the computer program stored in certain Read Only Memory chips (ROMs) located in the PAC–MAN game's printed circuit board; and (3) distribution of the CUTE–SEE modification kit as presently constituted would also violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Since the record does not reflect that any copies of the CUTE–SEE modification kit have been sold, there is not now any basis for finding Slayton in contempt of our March 23, 1982 order despite the fact that Slayton's advertisement of CUTE–SEE prompted these proceedings, and we decline to do so. For the reasons that follow, Midway is entitled to modification of the March

order to restrain any sales of the CUTE–SEE modification kit.

## Background

Midway's PAC–MAN—itself alone the subject of a proliferating number of judicial opinions [1]—has been highly successful. The game is marketed through a chain of distributors, who in turn sell game machines at an approximate per unit price of $2500 (Tr. 19) to individual so-called "operators," like defendant Slayton. The operators attempt to make a profit on their machines by charging quarters for plays of the game.

According to testimony at the hearing, Midway has produced and sold over 96,000 PAC–MAN games between November 1980 and January 1982. Among enthusiasts, the PAC–MAN game appears to have been as much a staple as hamburgers: by Midway's calculations, the game has been played over 2,000,000,000 times (Tr. 195) and the PAC–MAN craze has spawned over 500 Midway-licensed "PAC–MAN products," which feature in some form cartoon representations of the central figures or characters involved in the game. Thus, for example, there are products known as PAC–MAN bubble gum (Plaintiff's Exhibit (PX) 18), PAC–MAN candy (PX 19), PAC–MAN T-shirts (PX 20) and PAC–MAN wristwatches (PX 21).

PAC–MAN is a video arcade game in which the player by means of a hand-held control or "joystick" [sic] interacts, in effect, with images on a video screen. Using the control, the player manipulates a gobbler character, "the PAC–MAN," through a maze lined with dots. In the center of the maze is a "corral" from which, in the course of the game, four monster figures escape and pursue the PAC–MAN. As the PAC–MAN flees, he appears to gobble or consume the dots. "Power capsules," located in each of the four corners of the maze, complicate the play: when the PAC–MAN devours one of them, he is rendered capable of "counterattacking" the monsters, which, in turn, become ghosts and flee. The object of the game, roughly, is to cause the PAC–

MAN to eat as many dots as possible without being consumed himself by one of the monsters. Extra points are earned by consuming fruit targets that appear in the maze during the course of the game.

All of the foregoing occurs while the game is in its "play mode" after a quarter has been deposited in the machine. The PAC–MAN game also has a so-called "attract mode" in which a set pattern of sequences from the game is repeatedly shown on the video screen. The attract mode serves as a kind of advertising for the game as well as instruction in how to play it.

At the heart of the copyright controversy in this case is a set of Read Only Memory chips, ROMs, that contains both the visual data for the PAC–MAN game and the sequencing instructions that direct the play. Apparently, every PAC–MAN unit has on its circuit board a number of postage stamp-sized silicon chips onto which has been imprinted a highly complex and miniscule pattern of electronic circuitry. Each ROM has a specified location in the circuit board, designated by a letter-number location symbol. As we learned at the hearing (Tr. 39–40), the four ROMs at locations 6E, 6F, 6H and 6I are so-called "instruction ROMs" that contain the instructions and certain data used by a Central Processing Unit (CPU) or microprocessor to make game decisions, such as where the characters move on the video screen and whether or not one character chases another. The ROMs at locations 5F and 5E are "character ROMs" which contain information that causes the character images and other effects to appear on the video screen.

Midway holds copyright registrations for the audiovisual effects in the PAC–MAN game, registration number PA 83–868 effective on November 13, 1980, and for the computer program imprinted upon the six ROMs, registration number TX 753–817, effective on September 8, 1981.

Despite the considerable commercial success that the PAC–MAN game has enjoyed,

---

1. There is an extensive description of PAC–MAN in *Atari, Inc. v. North American Phillips Consumer Electronics Corp.,* 672 F.2d 607, 610–11 (7th Cir.1982).

individual operators, like the defendant Slayton, attempting to recoup their investments in their machines, have apparently suffered from the phenomenon of "pattern play," the ability of expert video games players, by means of a practiced or routinized series of "moves," to score enough points to play for an extended period of time on a single quarter. Alternatively, when players have so mastered the game that it is no longer challenging they no longer play. At some point, when enough players have become sufficiently expert at a game like PAC–MAN to pattern play the game or to lose interest in it, the individually owned machines cease to be profitable. As a result, there is a demand among operators of video games for "speed-up," "enhancement," or "update" kits, the purpose of which is to complicate and speed up the action of the games in order to make them more challenging for practiced players.

The CUTE–SEE enhancement kit for the PAC–MAN game, which is the subject of this proceeding, is one example of such an effort to improve the revenue from individual machines. The CUTE–SEE kit includes a set of pressure-sensitive graphics, instructions for placing the graphics over some but not all of the PAC–MAN trademarks on the game cabinets and a set of five ROMs with instructions for their installation in the PAC–MAN circuit board. The CUTE–SEE graphics appear to be intended to cover the words "PAC–MAN" wherever they appear on the cabinet although the words are faintly discernible underneath. The graphics do not cover several large cartoon representations of the PAC–MAN characters which also appear on the front and sides of every PAC–MAN cabinet. (*See* PX 3.1.a - 3.1.c) Nor does the CUTE–SEE kit provide any decals to cover smaller, similar PAC–MAN graphics around the border of the video screen. (PX 3.1.d)

The five CUTE–SEE ROMs are to be substituted in place of the PAC–MAN ROMs in locations 6E, 6F, 6H, 6J and 5F on the printed circuit board. Although the CUTE–SEE directions do not so provide (*see* PX 6), the CUTE–SEE modification that was demonstrated at trial also involved removal of the PAC–MAN ROM in location 5E, but without substitution of any new ROM there. The substituted ROMs appear to contain much of the same information as the original PAC–MAN ROMs—a subject to which we return later. The CUTE–SEE directions also instruct the purchaser to disconnect the sound system behind the header plate of the cabinet, thereby eliminating certain sound effects that accompany the PAC–MAN game.

As it appears on the video screen, the CUTE–SEE game is similar in its maze-chase conception to PAC–MAN. The CUTE–SEE maze in the initial phase of the game is quite similar to the PAC–MAN maze, although it is slightly more complicated. Like PAC–MAN, the CUTE–SEE maze is lined with apparently consumable material and the object of the game is to manipulate a character to eat as much of it as possible while eluding four pursuit figures. However, the CUTE–SEE characters bear no resemblance to PAC–MAN and his monsters. Because of the deletion of ROM 5E from the printed circuit board, the pursued and pursuer figures are nothing more than colored squares and, instead of dots, pink "tracks" appear on the screen and are consumed. At a more advanced stage of the game, after the maze has first been successfully cleared of track, the maze barricades disappear leaving only a pattern of pink tracks. And finally, at a third stage, the maze limitation on the chase is altogether eliminated, substantially enhancing the difficulty of eluding the pursuers.

### Copyright Issues

Amicus Shield raises the threshold argument that Midway's first sale of its PAC–MAN game machines exhausts or defeats any right of Midway to control the use or alterations of the copyrighted portions of those machines by the operators who own them. Shield relies almost exclusively on a line of patent cases suggesting such a limitation on the ability of patent-holders to control use of their inventions by the owners of individual copies. *See, e.g., Champion Spark Plug Co. v. Sanders,* 331 U.S. 125,

128–30, 67 S.Ct. 1136, 1138, 91 L.Ed. 1386 (1947) (holder of spark plug patent may not prevent lawful owner from rebuilding lawfully purchased spark plugs); *Wilbur-Ellis Co. v. Kuther,* 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964) (holder of patent on fish canning machine has no authority to prevent owner's "repair" of the machine to pack smaller-sized cans).

The holder of a copyright has certain statutorily-defined rights:

> Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
>
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

17 U.S.C. § 106. The copyright holder's exclusive rights, including the right to prepare derivative works, to display the work publicly and to perform the work are, as indicated, subject to specific limitations set out in the statute. *See* 17 U.S.C. §§ 107–118. Of these limitations, only that in Section 109, 17 U.S.C. § 109(a) and (b), giving the owner of a particular copy of a copyrighted work the right to resell or display that particular copy, is arguably authority for Shield's position.[2] Section 109 does not authorize adaptation and reproduction of a copyrighted work, however—essentially what Slayton proposes to accomplish with his modification kit—and Shield does not seriously argue that we should strain the statutory exception to encompass Slayton's work. *See* 2 M. Nimmer, Nimmer on Copyright § 8.12[D] (1982).

Without support in the legislation that exclusively governs the rights of the parties in this copyright dispute—whatever its merit as an initial proposition—Shield's argument cannot prevail.

> The statutory framework is unambiguous; the grant of exclusive rights is only limited by the statutory exceptions. Elementary principles of statutory construction would indicate that the judiciary should not disturb this carefully constructed statutory scheme in the absence of compelling reasons to do so. That is, we should not, absent clear direction from Congress, disrupt this framework by carving out exceptions to the broad grant of rights apart from those in the statute itself.

*Universal City Studios v. Sony Corporation of America,* 659 F.2d 963, 966 (9th Cir.1981), *cert. granted,* 457 U.S. 1116, 102 S.Ct. 2926, 73 L.Ed.2d 1328 (1982).

In a very recent decision, the Seventh Circuit dealt the final death blow to Shield's contention. *Midway Manufacturing Co. v. Artic International, Inc.,* 704 F.2d 1009 at 1013–14 (7th Cir.1983), concerned "speed up kits" manufactured by the de-

---

**2.** Lawful owners of copyrighted computer programs are permitted to adopt their programs for use "in conjunction with a machine," 17 U.S.C. § 117. This necessary limitation on the right of copyright holders is intended to permit owners of copies to make the programs compatible with their computer hardware or systems. *See* Final Report of the National Commission on New Technological Uses of Copyrighted Works 13–14 (1978). It is not authority for Slayton's sales of reproductions of Mid-

way's program as adapted. The last two sentences of Section 117 are as follows:

> Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

fendant for use in the plaintiff's video games. The only effect of installing the speed up apparatus, which is not described technically in the opinion, was to make the video screen action move at a faster pace; the speed up kits did not otherwise alter the nature of the images. *Id.* at 1010–11. The court reasoned, in effect, that in light of the enormous demand for enhanced or speeded-up video games, sale of particular machines to individual licensees or operators should not be construed as a conveyance of the right so to alter the equipment. *Id.* at 1013. The court held that the speed up kit was a derivative work, 17 U.S.C. § 106(2), and that therefore the licensees who installed it would be direct infringers and that the manufacturers before the court were contributory infringers of the plaintiff's copyright, citing *Universal City Studios, Inc. v. Sony Corporation of America, supra,* 659 F.2d at 975. *Ibid.*

■ Following *Artic International,* it is no defense to Slayton that Midway has parted with ownership of those machines with which the CUTE–SEE update kit is intended to be used: if the CUTE–SEE modification kit infringes any of the copyrights connected with the PAC–MAN games, it may not be distributed. It is to the difficult infringement issues that we now turn.

■ Midway contends that the audiovisual material produced by the CUTE–SEE modification kit infringes its "audiovisual works," 17 U.S.C. § 101, copyright in the images and accompanying sounds displayed in the course of play of the PAC–MAN game. As a number of recent decisions have recognized, video game images and sounds are "other audiovisual works" that are "fixed in [a] tangible medium of expression," 17 U.S.C. § 102(a)(6), and are therefore appropriate subject matters for copyright protection. *See, e.g., Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852, 855–56 (2d Cir.1982); *Williams Electronics, Inc. v. Artic International, Inc.,* 685 F.2d 870, 874 (3d Cir.1982); *Midway Manufacturing Co. v. Artic International, Inc., supra,* at 1011; *Midway Manufacturing Co. v. Dirkschneid-*

*er,* 543 F.Supp. 466, 480 (D.Neb.1981). Slayton does not dispute this now well established proposition. He contends only that there is not sufficient similarity between the CUTE–SEE audiovisuals and those of the PAC–MAN game for the former to constitute an infringement of Midway's copyright.

The Seventh Circuit's decision in *Atari, Inc. v. North American Phillips Consumer Electronics Corp.,* 672 F.2d 607 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982), is recognized by both parties as controlling not only because it is a very recent statement of the law, but also because that case as well involved the PAC–MAN game which is in issue here. There the court held that infringement had been established—as it is sought to be here—by the circumstantial evidence (1) that the defendant had access to the copyrighted work and (2) that there existed "substantial similarity" between the accused and the copyrighted works. *Id.* at 614. In *Atari,* as here, there was no dispute that the defendant had had access; the difficult question was whether the allegedly infringing video game, "K.C. Munchkin," was substantially similar to PAC–MAN, the copyrighted audiovisual work.

The starting point for analysis is the codification in 17 U.S.C. § 102(b) of the axiom that copyright protection extends only to particular "expression," not to concepts or "ideas" that may be abstracted from concrete embodiment. Section 102(b) provides:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

Thus, the *Atari* court reasoned that the "idea" of "a maze-chase game in which the player scores points by guiding a central figure through various passageways of a maze and at the same time avoiding collision with certain opponents or pursuit figures which move independently about the maze," 672 F.2d at 617, is unprotectible.

Moreover, the court reasoned, certain elements of the PAC–MAN game are effectively *"scenes a faire"*—sufficiently indistinguishable in their concrete expression from their abstract conception that they should receive protection only from "virtually identical copying:"

> The maze and scoring table are standard game devices, and the tunnel exits are nothing more than the commonly used "wrap around" concept adapted to a maze-chase game. Similarly, the use of dots provides a means by which a player's performance can be gauged and rewarded with the appropriate number of points, and by which to inform the player of his or her progress.

*Ibid.*

In *Atari,* the court found that the defendant had infringed the copyright in PAC–MAN's audiovisuals because it had appropriated PAC–MAN's "expression of the central figure as a 'gobbler' and the pursuit figures as 'ghost monsters.' " *Ibid.* The court explained:

> North American not only adopted the same basic characters but also portrayed them in a manner which made K.C. Munchkin appear substantially similar to PAC–MAN. The K.C. Munchkin gobbler has several blatantly similar features, including the relative size and shape of the "body," the V-shaped "mouth," its distinctive gobbling action (with appropriate sounds), and especially the way in which it disappears upon being captured. An examination of the K.C. Munchkin ghost monsters reveals even more significant visual similarities. In size, shape, and manner of movement, they are virtually identical to their PAC–MAN counterparts. K.C. Munchkin's monsters, for example, exhibit the same peculiar "eye" and "leg" movement. Both games, moreover, express the role reversal and "regeneration" process with such great similarity that an ordinary observer could

conclude only that North American copied plaintiffs' PAC–MAN.

*Id.* at 618.

It follows from the reasoning of *Atari* that the CUTE–SEE modification kit which we saw demonstrated at the hearing [3] does not infringe Midway's copyright of the PAC–MAN audiovisuals. The PAC–MAN characters have altogether disappeared in the CUTE–SEE version of the game. Instead of a central gobbler and ghost monsters, the CUTE–SEE chase is played out by a set of block figures that travel along a disappearing track. The distinctive, copyrightable features of PAC–MAN are not present in CUTE–SEE and, therefore, the latter game is not an infringement.

Midway appears to argue that the CUTE–SEE game from which the full six ROMs have been removed is not the proper one for comparison in determining whether Slayton is contributing to operators' infringement of the PAC–MAN audiovisual copyright. Midway demonstrated at the hearing that installation of the five ROMs provided as part of the CUTE–SEE modification kit without removal of the ROM 5F will result in audiovisuals in which the distinctive PAC–MAN characters are still featured. *See* PX 3.3.a—3.3.f And Midway suggests that we should take account of the unlikelihood of any operator's removing ROM 5F, the ROM on which the information that produces the distinctive gobbler and ghost monster figures on the video screen is stored, and hold Slayton liable as a contributory infringer based on the "substantial similarity" of the CUTE–SEE modification, *with ROM 5F in place,* to the original PAC–MAN audiovisuals.

It is certainly true that CUTE–SEE as it appears with ROM 5F in place on the circuit board is "substantially similar" to PAC–MAN. That version of the CUTE–SEE game contains in unaltered form all of the PAC–MAN characters and is apparently nothing more than an "enhanced" version of PAC–MAN. If an operator to whom the

**3.** Photographs of the audiovisual display of the CUTE–SEE modification kit are included in the record as plaintiff's exhibits 3.2.a–3.2.1. Photographs of the PAC–MAN audiovisuals are plaintiff's exhibits 1.2.a–1.2.m.

CUTE–SEE modification kit were sold failed to remove ROM 5F prior to offering the machine with CUTE–SEE modification for play, that operator would clearly be a direct infringer of Midway's audiovisual copyright. *See Midway Manufacturing Co. v. Artic International, Inc., supra,* at 1013; *cf. Atari, Inc. v. North American Phillips Consumer Electronics Corp., supra,* 672 F.2d at 618. Moreover, if Slayton sold his CUTE–SEE modification kit with directions or encouragement to leave ROM 5F in place—that is, with the understanding that the modified game was to operate with six ROMs rather than with five—then it would follow that Slayton's sales constituted contributory infringement. *Midway Manufacturing Co., supra,* at 1013.

Midway would have us go further. Notwithstanding that Slayton proposes to offer for sale a modification kit that instructs its users to remove ROM 5F[4] and disconnect the PAC–MAN sound system, Midway contends that Slayton would be liable for the infringement that would occur if these instructions were not followed. Midway points to the commercial success of PAC–MAN and asks us to infer the "inconceivability" that any operator to whom the CUTE–SEE modification kit was sold would actually follow the instructions. Since, in Midway's view, it is entirely foreseeable that CUTE–SEE purchasers might infringe Midway's audiovisuals copyright, Midway argues that Slayton's sale of the CUTE–SEE kits, which would facilitate that possible direct infringement, should constitute contributory infringement.

There was, however, no competent evidence at the hearing as to what purchasers of the CUTE–SEE modification kits would likely do once that product was in their hands. It was not established that such purchasers would inevitably or probably fail to follow the written instructions that accompany the CUTE–SEE kits.

Midway has misinterpreted *Universal City Studios, Inc. v. Sony Corporation of America, supra,* 659 F.2d at 975, the case on which it principally relies. In *Sony Corporation,* the Ninth Circuit held the manufacturer of Betamax home video recorders liable as a contributory infringer of the copyrights to movies recorded by consumers with the machine. The court did conclude, as Midway emphasizes, that the defendant did not have to have "actual knowledge" of the infringing use of its machines in order to be liable as a contributory infringer. 659 F.2d at 975. But the crux of the Ninth Circuit's contributory infringement holding was that reproduction of copyrighted materials was "the most conspicuous use" of defendant's product: "That use is intended, expected, encouraged, and is the source of the product's consumer appeal." *Ibid.*

■ By contrast, here there is no evidence that Slayton expects or encourages his customers to infringe Midway's copyright in its audiovisual work. To the contrary. Slayton instructs his purchasers to install the modification kit in order not to infringe Midway's audiovisual copyright. Slayton does not have the authority to control his purchasers or to prevent their misuse of his product. And to hold him liable for conduct of unrelated third parties which he actually discourages would be an unwarranted extension of copyright liability for which no clear terminus is apparent. *Cf. Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 854 n. 13, 859–61, 102 S.Ct. 2182, 2188 n. 13, 2191–92, 72 L.Ed.2d 606 (1982) (White, J., concurring) (no contributory trademark infringement liability should be inferred from the fact that generic drug company could anticipate that some illegal substitution of its product for a brand product might occur).

Slayton argues that our conclusion that his modification kit does not infringe the

---

4. We note that the CUTE–SEE modification kit installation instructions in the record as plaintiff's exhibit 6 do not, in fact, direct purchasers to remove PAC–MAN ROM 5F. It was represented to us that this was the result of oversight merely. The CUTE–SEE modification kit demonstrated at the hearing did not have PAC–MAN ROM 5F in place and we naturally assume that if CUTE–SEE were marketed, proper instructions on its installation would be provided which would direct removal of ROM 5F.

PAC–MAN audiovisual copyright should be the end of the case: "In the context of video games litigation, the court must focus on the substantial similarity between the games, as the program and display are intertwined to the extent that it is impossible to consider one without the other." Defendants' Reply Brief at 2–3.

■ Since Midway has registered copyrights both on the audiovisual display of the PAC–MAN game and, in addition, on the underlying computer program that directs the play, the *prima facie* validity of both copyrights is established. *See Flick-Reedy Corp. v. Hydro-Line Manufacturing Co.,* 351 F.2d 546, 549 (7th Cir.1965), *cert. denied,* 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966). And we agree with Midway that the audiovisual display and the computer program are not so "intertwined" as to preclude their separate consideration. In fact, the computer program is a distinct creation.

As the evidence before us clearly showed (Tr. 73), and as the Second Circuit has also recognized, *Stern Electronics, Inc. v. Kaufman, supra,* 669 F.2d at 855, it is quite possible to design a game that would infringe Midway's audiovisual copyright but would use an entirely different computer program. The converse possibility, into which we inquire today, that a game's computer program but not its audiovisuals could be an infringement, is not foreclosed as a matter of logic and should not be as a matter of policy. The skill, ingenuity and effort that is required to design the computer program which operates the game is altogether different from the process of conceiving and designing the distinctive PAC–MAN characters. Accordingly, the Third Circuit in *Williams Electronics, Inc. v. Artic International, Inc., supra,* 685 F.2d at 873–77, tacitly recognized, as we expressly do today, that the computer program copyright connected with a video game is pro-

tectible separately from the audiovisual copyright.

■ The foregoing assumes, however, that Midway may assert copyright protection for its four instruction ROMs on the theory that they are or contain a "copy" of the computer program that was developed to operate the PAC–MAN game. This question is easily the most significant—and the most difficult—before us today. Although we find the issue not free from doubt, we conclude, on the basis of the less than thoroughly developed record before us,[5] that Midway's ROMs are entitled to protection as a computer program and that the CUTE–SEE ROMs proposed to be sold as part of defendant Slayton's modification kit infringe that copyright.

Both parties apparently agree that the availability of copyright protection for Midway's ROMs, registered in 1981, is governed by the Computer Software Copyright Act of 1980, Pub.L. 96–517, 94 Stat. 3015 (1980), which amended the Copyright Revision Act of 1976 to add a definition of "computer program" in 17 U.S.C. § 101 and to eliminate former 17 U.S.C. § 117 which had raised the possible continued applicability to computer programs of the 1909 Copyright Act, *see Data Cash Systems, Inc. v. J S & A Group, Inc.,* 480 F.Supp. 1063, 1067 (N.D.Ill. 1979), *aff'd on other grounds,* 628 F.2d 1038 (7th Cir.1980). Section 117 now provides that the lawful owner of a copyrighted computer program may adopt the program for use "in conjunction with a machine" or copy the program "for archival purposes." *See* footnote 2, *supra.* The "computer program" definition in Section 101 is as follows:

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

One of the most significant aspects of the 1976 legislation, also relevant to the computer program issue, is the definition of

---

**5.** Midway called two expert witnesses at the one day hearing in this matter. The relatively brief testimony of these witnesses was, with respect, sometimes not cogent and occasionally conclusory. Slayton did not introduce any expert testimony, an omission that is glaring and unfortunate in light of the highly technical nature of this controversy.

"copy" inherent in Section 102(a), which delimits the subject matter of copyright protection:

> (a) Copyright protection subsists, in accordance with this title, in original works of authorship *fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.* Works of authorship include the following categories:
>
> (1) literary works;
>
> (2) musical works, including any accompanying words;
>
> (3) dramatic works, including any accompanying music;
>
> (4) pantomimes and choreographic works;
>
> (5) pictorial, graphic, and sculptural works;
>
> (6) motion pictures and other audiovisual works; and
>
> (7) sound recordings.

17 U.S.C. § 102(a) [emphasis added].

The deceptively simple 1980 addition to the Section 101 definitions reflects the fact that computer instructions necessarily take at least two forms. Clearly eligible for protection, in accordance with copyright principles that antedate the 1976 and 1980 legislation, are the "high level" computer programs written in "human readable" "source code"—examples of which are FORTRAN or BASIC. Computers do not act directly on such source code instructions, however. Instead, the source code must be transformed, within the machine, into a proportionately enormous series of binary, "machine readable," "object code" instructions: the presence or absence of an electrical charge, which may be represented by the values "1" or "0", at each cycle of a computer's operation is what ultimately directs the computer's activity. *See generally* W. Schmidt, Legal Proprietary Interest in Computer Programs: The American Experience, 21 Jurimetrics J. 345, 350–53 (1981).

It is the object code, which is in effect stored in the ROMs on Midway's PAC-MAN circuit board, for which Midway claims copyright protection. As we understand it, a ROM silicon chip is only one medium of several in which the object code version of a computer program may be stored—so-called "floppy discs" and magnetic tape are other examples.

It is certain as a general matter that the current copyright legislation is intended to protect object code as well as source code. Encompassed by the Section 101 computer program definition are sets of statements or instructions to be used *"directly"* in a computer to achieve a certain result and it is apparent that object code alone is able to be used "directly" by a computer in carrying out its operations. What legislative history there is of the 1980 amendments confirms that protection for object code was intended. *See* Final Report of the National Commission on New Technological Uses of Copyrighted Work 21 (1978) (CONTU report).[6] And several courts have concluded that, since "copyright protection subsists ... in original works of authorship ... [that] can be perceived ... with the aid of a machine or device," 17 U.S.C. § 102(a), machine readable object code is protectible by copyright. *See Williams Electronics, Inc. v. Artic International, Inc., supra,* 685 F.2d at 875–77; *Tandy Corp. v. Personal Micro Computers, Inc.,* 524 F.Supp. 171, 173 (N.D.Cal.1981); *Hubco Data Products Corp. v. Management Assistance, Inc.,* No. 81-1295, slip op. at 7–11 (D.Idaho February 3, 1983); *GCA Corp. v. Chance,* No. C–82–1063 MHP, slip op. at 2–3 (N.D.Cal. August 31, 1982).

Whatever its merit as an original matter, the 1976 Copyright Revision Act has foreclosed the argument that object code—

---

**6.** The Commission on New Technological Uses, in 1976, at Congressional direction undertook a study of computer programs and copyright. The Commission's report advocated adoption of legislation identical to the 1980 Computer Software Copyright Act. Although the Congressional action in 1980 does not appear to be supported by a legislative history, it is fair to conclude, since Congress adopted its recommendations without alteration, that the CONTU Report reflects the Congressional intent.

meant to be read by machines rather than humans and incomprehensible to any but highly trained computer specialists—is not a proper subject for copyright protection. Since, as we understand it, the object code is nothing other than a direct transformation of a computer program composed, at considerable expense of creative effort, in source code, the evident Congressional policy determination that both forms of the computer program are protectible is an eminently sound one. To allow protection of the source code version of a program would be pyrrhic indeed if the object code version, the mechanical implementation of the same program, stored and marketed on discs or tapes, for example, could be freely reproduced without constituting an infringement. *Accord Williams Electronics, Inc. v. Artic International, Inc., supra.*

It has been suggested that, where the object code is stored in a ROM silicon chip rather than on a tape or disc, the result should be different. Silicon chips, it is argued, are themselves a form of computer circuitry or hardware and are therefore utilitarian objects for which copyright protection is not available. *See Apple Computer, Inc. v. Franklin Computer Corp.,* 545 F.Supp. 812, 823 (E.D.Pa.1982); *Data Cash Systems, Inc. v. J S & A Group, Inc., supra,* 480 F.Supp. at 1067 n. 4 (dicta). A ROM chip, actually, is neither strictly "hardware," a purely mechanical component of a computer, nor "software," a "drive" or set of instructions external to the machine. Such chips, which are part of every modern computer, are generally designated "firmware," when they contain information beyond the minimum necessary to turn the machine on, reflecting the fact that they share attributes of both: like hardware, they are integral to the machine as a form of circuitry through which electric current passes directly; but like software, they do in fact serve as repositories for computer instructions in object code. *See* W.

Schmidt, Legal Proprietary Interests in Computer Programs, *supra,* 21 Jurimetrics at 350–51.

Judge Newcomer's extensive and thoughtful analysis in the *Apple Computer* case [7] sets the intellectual complexity of the issue somewhat in relief:

> From plaintiff's point of view, the best argument is that the idea of the operating system is the "original work" and that all that follows are copies. The counter-argument that plaintiff must respond to is a technical one that goes to the heart of the technology: in the case of the programs on ROM did the programmer-designer imagine the architectural structure of the ROM, the overlay of micro-switches that would be most economical and efficient for the system, or did he envision the flow chart of operations which the program would perform? If the former, the programmer may be said to have been an engineer designing a utilitarian aspect of the machine. If the latter, the programmer may not be said to have designed the architecture of the chip.

545 F.Supp. at 820–21.

But eschewing the epistemological inquiry hinted at by Judge Newcomer, we find the legal issue relatively straightforward. Mindful that the record before us is scant—it contains, for example, no indication of the technical considerations that would influence a decision to store object code on a ROM rather than on a disc—we see no basis for concluding, in effect, that object code stored on a silicon chip may be freely copied while the same code stored on a tape or disc may not be. The policy considerations noted above with respect to object code generally appear equally applicable to ROMs. The fact that, as we understand it, electrical current moves through a silicon chip rather than being remotely directed in its movement by information on a

---

**7.** The Apple Computer case was before the court on plaintiff's motion for preliminary injunctive relief.

Since the Eastern District of Pennsylvania decision in *Apple Computer* appears irreconcil-

able with *Williams Electronics, supra,* decided in the Third Circuit several days later, the former decision appears to lack precedential force.

tape or disc, does not in our view serve as a tenable basis for concluding that a ROM is somehow more "utilitarian" than a tape or disc. In both cases, the function of the object is to store information which directs the operations of a computer. On this record, the distinction for which Slayton argues would be anomalous. And we conclude that Midway's copyright of the object code computer program stored in ROM silicon chips is valid. *See Williams Electronics, Inc. v. Artic International, Inc., supra,* 685 F.2d at 875–77 (object code stored on a ROM protectible by copyright); *Tandy Corp. v. Personal Micro Computers, Inc., supra,* 524 F.Supp. at 173 (same); *Hubco Data Products Corp. v. Management Assistance, Inc., supra* (same); *GCA Corp. v. Chance, supra* (same).

Accordingly, we turn to the question whether the CUTE–SEE ROMs to be sold as part of defendant Slayton's modification kit infringe the copyrighted PAC–MAN ROMs. Slayton undisputedly had access to the PAC–MAN ROMs. And we may therefore infer copying if the CUTE–SEE ROMs are "substantially similar" to those of PAC–MAN. *See Atari, Inc. v. North American Phillips Consumer Electronics Corp., supra,* 672 F.2d at 614. This inquiry is unusual here because of the technical nature of the works involved. Nonetheless, the record before us overwhelmingly supports the conclusion that the CUTE–SEE ROMs are substantially similar to the PAC–MAN ROMs.

The four ROMs alleged to have been copied contain all of the "instructions" used to direct the sequence of the play as well as some "data" or information that is transmitted for display on the screen.[8] It is

apparently possible, using a so-called Microcomputer Development Lab, to print out the information stored on the ROMs. (Tr. 41–47) And in evidence before us are printed out listings of over 16,000 units or "bytes" of information contained on the four PAC–MAN ROMs (PX 7) and of a like number of bytes on the CUTE–SEE ROMs (PX 8). Each of the over 16,000 bytes in the exhibits consists of a numerical value expressed in base sixteen—a sixteen digit counting system.[9] In fact, the 16,000 units of information are an "assembly code": each of the bytes is itself a summary of eight individual "bits" or binary instructions; thus, in each set of four ROMs there is a total of over 128,000 units of binary information, or object code. (Tr. 122)

It appears that the full 16,000 locations are not necessary to program the PAC–MAN game. Thus, at the end of two of the PAC–MAN ROMs there is a substantial series of uncoded locations in each of which the "00" value appears on the print out. By contrast, the corresponding locations on the CUTE–SEE ROMs all contain encoded information.

Midway established at the hearing that 89% of the 16,000 bytes in the PAC–MAN ROMs is identically reproduced in the corresponding CUTE–SEE ROMs. Moreover, Midway showed that of the more than 16,000 bytes, 13,382 contain actual sequencing instructions, as distinct from data that appears directly on the screen. *See* footnote 9, *supra.* The ratio of identity between PAC–MAN and CUTE–SEE is significantly higher when the 13,382 instruction locations are considered in isolation: over 97% of

**8.** Midway's experts distinguished between the "instructions" and the "data" that are stored on the four ROMs. "Instructions" are responsible for directing the movements of the game characters in response to the player's operation of the game's controls. "Data" are directions to the computer to display certain information directly on the screen; for example, certain bytes on the ROMs cause the screen to display terms like "HIGH SCORE" or "CREDIT." (Tr. 51–55)

**9.** Testimony regarding the mechanics of base sixteen counting consumed an inordinate por-

tion of the hearing. Simply, base sixteen operates on the principle that, instead of 10, there are sixteen possible values in the most right-hand column of a number. The convention is to express the six greatest values by the letters "A" through "F" and the first ten by the arabic numerals. Each numeral in the second column is a function of $16^1$ (base ten); in the third column each numeral is a function of $16^2$ (base ten).

Thus, in base sixteen, the number "2A" is equivalent to 42 in base ten: "A" equals 10; and "20" equals 32.

those locations are identical; only 381 of the 13,382 contain different information in the CUTE–SEE ROMs. (Tr. 138) Midway's experts identified three long strings of identical locations between the CUTE–SEE and PAC–MAN ROMs. The longest of these, which covered 3984 locations, spanned virtually an entire ROM. (Tr. 139).

The degree of similarity, while not absolute, is substantial. As we have previously noted, the uncontradicted expert testimony at the hearing was that there is virtually an infinite number of ways to write a set of program instructions that will produce the PAC–MAN game sequencing. (Tr. 73) It is thus not at all necessary that the assembly code or object code phases of a computer program that would operate a maze chase game track the PAC–MAN program.[10] The fact that the alterations in the PAC–MAN program—which concededly have a substantial effect on the play of the game—occur largely in the blank or uncoded locations at the end of two of the ROMs further supports the inference that the CUTE–SEE program was created by copying the PAC–MAN program and then "patching" additional, new program information into the work. (*See* Tr. 132) The high degree of identity of the two programs and the virtual impossibility that two programmers working independently would write so nearly identical programs compels the conclusion that the CUTE–SEE ROMs designed for placement at locations 6E, 6F,

6H and 6J on the PAC–MAN circuit board infringe the computer program stored in the corresponding PAC–MAN ROMs.

Slayton argues that we may not limit our analysis to the four so-called instruction ROMs; that the full PAC–MAN program is stored on a total of six ROMs; and that therefore we must be satisfied that there exists a substantial similarity of all five CUTE–SEE ROMs to the six PAC–MAN ROMs before we may find the former infringing. We are not persuaded. Just as it would surely be an infringement to copy one chapter of a novel or one volume of a multi-volume work, so the fact that Slayton did not also copy the data stored on ROMs 5E and 5F does nothing to mitigate the piracy of the portions of the program stored in ROMs 6E, 6F, 6H and 6J. *Cf. Schroeder v. William Morrow & Co.,* 566 F.2d 3 (7th Cir.1977) (infringement to copy 27 pages of a 63-page directory of gardners).

### *Trademark Issue*

Midway also contends that sale of the CUTE–SEE modification kit in its present form would constitute "false designation of origin" and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[11]

As we have described it above, the CUTE–SEE modification kit would consist in part of pressure sensitive graphics which would obscure[12] the name PAC–MAN where it appears on the front and sides of

---

10. Midway's expert also testified that his examination of the assembly code print outs of the programs that operate the video games "Galaxian" and "Space Invaders" revealed no similarity to that of PAC–MAN. (Tr. 116–17)

11. Section 43(a) of the Lanham Act provides:
     Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to

any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

12. In their present form, as we observed at the hearing, the CUTE–SEE graphics are translucent and the words "PAC–MAN" are faintly discernable beneath them after they are put in place. Our assumption, upon which we decide the trademark issue, is that Slayton could and would improve his graphics so as to fully conceal the words "PAC–MAN" and the cartoon characters.

Midway's game cabinet. The graphics would not cover large-scale cartoon representations of the PAC–MAN and a ghost monster, the characters in the PAC–MAN game. *See* PX 3.1.a—3.1.c. Nor would they conceal similar, smaller-scale cartoons that surround the video screen. *See* PX 3.1.d.

█ It is likely that the CUTE–SEE graphics combined with the unconcealed portions of the PAC–MAN graphics would mislead potential customers into concluding that the CUTE–SEE modification kit emanates from Midway. And it would therefore be violative of Section 43(a) of the Lanham Act for Slayton to market his modification kit without enlarging his graphics so as to completely conceal both the PAC–MAN name and the PAC–MAN cartoons. *See generally* 1 J. Gilson, Trademark Protection and Practice § 7.02[1] (1979).

As we have described above, Midway has extensively advertised its PAC–MAN game through the use of these cartoon representations. The cartoons are associated with numerous licensed PAC–MAN products and appear on each of the many thousands of PAC–MAN games already in the marketplace. What Slayton proposes is to retain these cartoon graphics in absolutely unaltered form on a similar game that will be marketed to the same unsophisticated, *Atari, supra,* 672 F.2d at 610, group of consumers whom Midway has sought to attract. Moreover, another court has already concluded, and we agree, that the PAC–MAN cartoon figures are fanciful and protectible in any event even without proof of secondary meaning. *Midway Manufacturing Co. v. Dirkschneider,* 543 F.Supp. at 485; *see generally Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir.1977).

On the strength of this record, therefore, we have little difficulty in concluding that the PAC–MAN cartoons are associated in the minds of consumers in the market with the Midway product, that their retention on the CUTE–SEE game cabinet would likely confuse consumers and that Section 43(a) of the Lanham Act prohibits Slayton's use of them. *Cf. S, K & F Co. v. Premo Pharmaceutical Lab,* 625 F.2d 1055 (5th Cir.1980) (Section 43(a) proscribes the common law tort of unprivileged imitation: there, the imitation of formerly patented drug's capsule color, shape and form, which had acquired secondary meaning); *Bulova Watch Co. v. Allerton, Co.,* 328 F.2d 20 (7th Cir. 1964) (enjoining use of the name "Bulova" on recased watches that contained Bulova watch movements).

The fact that Slayton has attempted to conceal the name PAC–MAN wherever it appears on the game cabinet cannot save him from false designation of origin liability with respect to the unobscured cartoon representations. We have concluded that the cartoon figures themselves are associated in the public mind with Midway's PAC–MAN game and, particularly among the generally youthful and relatively unsophisticated consumers of video games, the substitution of another name for PAC–MAN in connection with the same cartoons would not diminish the confusion or the natural tendency to assume that the CUTE–SEE game emanated from the same source as PAC–MAN. *Cf. Warner Brothers, Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981) (use of symbols associated with the "Dukes of Hazzard" "General Lee" car even without use of the name "General Lee" constituted false designation of origin).

## CONCLUSION

For the reasons stated, defendant Slayton is enjoined from marketing the CUTE–SEE modification kit demonstrated at a hearing before us on December 15, 1982. Midway's motion to hold defendant Slayton in civil contempt of this Court is denied.